Mr. Cochran is here for Mr. Wengert Mr. Clobbert is here for Sheriff Israel Ms. Rienstein is here for Sheriff Israel in his official capacity and Ms. Heyer is here for Taffe. Mr. Cochran, you may begin. Mr. Cochran It pleases the court, the issue in this appeal is whether Deputy Wengert is entitled to qualified immunity and whether the district court properly denied his motion for summary judgment on qualified immunity grounds. So the legal issue is whether Deputy Wengert violated clearly established law when he shot and killed Stephen Thompson under the totality of the circumstances, a core qualified immunity issue. The district court's order, while it recites the standard for summary judgment motion and it cites the standard for qualified immunity law, it does not engage in proper application of those standards in this case. Much like the claims against the sheriff in his official capacity, the Monell claim, and in his individual capacity, the court does not engage in the qualified immunity analysis with respect to Officer Wengert. Mr. Clobbert What do we make of this Officer Yoder's two different statements about the gun? One statement suggesting he didn't touch it, the other statement suggesting he kicked it which explains why it's 50 feet away, which, how does that work? Same person. It's the same person. So Deputy Yoder's testimony in his deposition was that he kicked the gun away when they first entered into that corridor. He and Deputy Koutsoufias were approaching from one end and Deputy Wengert and Clark were approaching from the other end of the hallway where Deputy Wengert had been firing. And as they approached, he saw the gun was still in proximity to the suspect, Mr. Thompson, and kicked it away to secure the scene. Now in the initial statement that was given, when he mentioned he did not touch it, my understanding of that was that it was in the context of once the weapon had been secured so that the crime scene was kind of locked down. That was supposed to be a statement after it had been kicked? Yes, that's my understanding. Was that clarified in the deposition? I don't believe that it was specifically asked in the deposition in one way or another, Your Honor. But Deputy Wengert also testified that Deputy Yoder kicked the weapon away to secure the scene at that time. So and Your Honor points out, this is one of the issues. The court in its order denying the summary judgment motion, it says as facts, as disputed allegations and arguments of the plaintiff's counsel and elevates them to facts. What the court did not do, which is how you apply a qualified immunity analysis, is determine the operative set of facts that are supported by the record, view those in the light most favorable to the plaintiff or the non-movement, and indulge any reasonable inferences . . . I guess what the district court judge would say is, listen, this gun is fifty feet away, that's really strange. And I'm going to credit the Yoder first statement that he didn't move it, so now we're back to the possibility that Wengert moved it. I mean, isn't that how the district court . . . I mean, I get it that there's still no affirmative evidence explaining how it got there. That means there's no evidence, but I think that's what the district . . . Well, there's affirmative evidence in the sense that Deputy Yoder testified that he kicked it, and Deputy Wengert, in his, I believe it was interrogatory answers, stated that he kicked the weapon. So that is one explanation for it there. The other thing is, looking at the totality of the evidence, nobody puts Wengert in the vicinity of that weapon in a position to do that. There are already at the time that that happens, there are several deputies in the hallway. Officer Weeks, who was a Lauderdale officer, looked in at one point. The testimony of the law enforcement personnel is uniform. They peeked in immediately after the shooting. As soon as it stopped and subsided for a few seconds, they basically looked in, they saw the gun in the general area of the plaintiff. There's minor discrepancies as to the distance that they saw it from there, but then there's the evidence that it was kicked. But in light of not only that evidence, but the evidence that there was a recovered shell Wengert says that he was at when the shot was initially fired at him by Mr. Thompson, you have to look at the totality of the evidence and whether that one fact, whether that one piece of evidence, the piece of evidence that Detective Caceres came in at 1240 AM and measured the gun at that distance away, is enough to preclude summary judgment. But the court didn't apply that analysis. The court didn't accept that fact and say, based on that fact, there was a violation of a constitutional right that was clearly established. The court just kind of applied a summary judgment standard and said there's a disputed issue of fact. And that's not the way qualified immunity is supposed to go. It militates against the very purpose of the doctrine, which is to protect individuals acting under discretionary authority from suit, which is what we have here. Another example of something that the court described as a fact, but then also just said that the plaintiff disputed, essentially, Deputy Wengert's account, was about the description of the suspect. She said the court in the document says that the suspect was wearing black athletic shorts with a white diamond down the side of them. But that ignores the record evidence that the paramedic who treated Mr. Thompson at the scene was wearing a pair of clothing to help assess and treat the injury, and there was an all-black pair of cargo shorts that was recovered by the pool of blood at the scene. So it's not taking into account the collective evidence in the record. It's just cherry-picking certain pieces and going with inferences that no reasonable jury could support based on the totality of the evidence and the testimony. So should we vacate and remand for the district court to apply the proper test on qualified immunity? No, Your Honor. We believe that the court has the benefit of the record here. The court has the benefit of oral argument, the records before the court. The court should go ahead and do the analysis. It would not serve judicial economy to send it back, have it redone again, and it would defeat the purposes of immunity, which is to protect individuals like Deputy Wengert from suit. I see them over time. All right. Thank you, Mr. Cochran. We'll hear from Ms. Klauber. Good morning. May it please the Court. I'm Deborah Klauber, along with my partner Ken Miller from Halleck, Zurp, Pettis and While I agree that Deputy Wengert, under the facts of this case, is entitled to qualified immunity, my argument today isn't based solely on that determination. I'm here to address the supervisory or individual liability claim against Scott Israel, now the former sheriff of Broward County. The Supreme Court recently called supervisory liability claims a misnomer because they really don't involve the supervisory actions. It's an individual liability claim. These cases involve exceptional circumstances and the 11th Circuit has applied an extremely rigorous standard to them. This claim requires Scott Israel's personal involvement on some level that can be tied to the alleged constitutional violation by the deputy. Here, even the district court agreed that Scott Israel was not present at the time of the shooting, was not aware that it was going to occur, and that his actions in showing up after the fact to see what happened can't be causally related to the purported violation. What do we make of all the prior investigations of this officer, Wengert? I'm sorry, what do we make of them? Yeah, I mean... So, the investigations and all of the discipline and other things that were handled by the sheriff's department, to the extent that they state a claim, would state a claim against the sheriff's office or the sheriff in his official capacity. This is a separate claim that's seemingly the same. Frankly, I think the complaint, the response to the summary judge... Well, the sheriff would have been aware that he'd previously been prosecuted by the state attorney's office for falsifying records, official misconduct, and battery. The sheriff may have been aware of that information. There's no record evidence that he was, in fact, aware of that information. Much of this responsibility had been delegated to others within his command. To suggest that the sheriff... It's almost suggesting that it's a vicarious liability or a spondiot superior, because he's the sheriff, therefore he must know these things. But again, we're still not distinguishing between the sheriff in his individual capacity and the sheriff in his role as the sheriff of Broward County. The argument in the brief essentially is very circular. Since Scott Israel is the ultimate policymaker, since he is in the role as the sheriff, and since this incident occurred with Deputy Wengert, therefore he must be responsible. Wengert violated policies and therefore wasn't being supervised. The vast majority of the supervision and training cases in the 1983 context are municipal or official liability claims. They're not individual claims. And all of the allegations here really talk about what Sheriff Israel may or could or should have done in his capacity as the sheriff. Not some individual personal action by Scott Israel, the individual, as opposed to in his role as the overall sheriff of Broward County. And there's an additional factor that applies here that doesn't apply when the court's addressing a 1983 claim under Monell. Here, because it's against Sheriff Israel in his individual capacity, we also have the question of whether the law is clearly established. And in a number of decisions that have been cited in both of our briefs, in the context of an individual claim against a sheriff or a police chief, the courts have found that the law is not clearly established. There is no set of examples of how a sheriff must discipline his employees, how a sheriff must train his employees, that if you don't do it this way or you haven't done X, Y, or Z, therefore, a constitutional violation is likely to occur. So the distinction here, all of the allegations, it really is a combination of buzzwords. This is a Monell claim with the added buzzword of individual and some deliberate indifference and things. There's a very high standard and a number of hoops the plaintiff has to jump through to state a claim against the sheriff in his individual capacity. A history of widespread abuse that has to be obvious, flagrant, rampant, and of continued duration. Those other instances have to be substantially similar to this case. There must be deliberate indifference. This is also a stringent standard. On the part of him in his individual capacity, not in his overarching role as the sheriff of Broward County, that somehow led to a policy or custom that's causally linked to this violation. Respectfully, none of those standards have been matched here. The bottom line is twofold. There's been no constitutional violation by Scott Israel. He wasn't personally engaged or involved in a way that would expose him to that kind of liability. Just as importantly, even if it could be shown that they were linked somehow, there is no clearly established law that put him on notice of what exactly needed to be done. That some particular use of discipline or some specified training would have been necessary to avoid a constitutional violation by his officers. We believe qualified immunity bars the claim, the individual claim against Sheriff Israel, and that this court should reverse the denial of summary judgment on that basis. Thank you. Thank you, Ms. Klobber. We'll hear from Mr. Reinstein. Excuse me. If it may please the court, Louis Reinstein on behalf of the Broward County Sheriff in his official capacity. I'm up for three minutes. Since these issues are carried with the case regarding the sheriff in his official capacity, I want to start with Judge Pryor's comment about, well, should we vacate and remand to apply the proper analysis of qualified immunity? If that's the question, then it also would be to apply the Monell question. But like Counsel, Mr. Cochran, is that it's now before you. This court has jurisdiction over the sheriff's office because the district court's order makes clear that it found the issues against the sheriff's office to be inextricably intertwined with denial of qualified immunity to Deputy Wenger and Scott Israel. As to Wenger, there are two examples in the district court's order. On page eight, where the court specifically says, we're setting aside whether Israel was negligent in implementing, hiring, supervision and retention policies of the sheriff's office and then focuses on Deputy Wenger. And then on page 10, where the court said, well, count five hinges, at least in part on whether Wenger violated Thompson's constitutional rights and then goes ahead and ignores the Monell analysis. This court can also find that the handling of Sheriff Israel's qualified immunity claim is also inextricably intertwined with the sheriff's office claim because the lower court said so. The lower court treated them as one in the same. I mean, practically speaking, I get it that the Monell claim disappears if there's no underlying claim. Why does that mean there has to be interlocutory review? I mean, the court of appeals could just decide Wenger wins as a matter of law. Now the district court has that information and they obviously apply it in dealing with the Monell claim. I don't know why it has to come up here with us because, of course, once it's here, you not only decide that first question, but then you have in front of you the Monell question, which is quite different. Yes, Your Honor, and Judge Sutton, it's correct that if the court was to rule that Deputy Wenger had qualified immunity, then that would get rid of the Monell claim. However, what we have is that the case law regarding pendent jurisdiction says that if the case, if it's inextricably intertwined, and in the actual district court order, the district judge treats it as if it's inextricably intertwined. Whether it is or not is maybe a different question, but the way that it's treated is that the district judge doesn't rule on the Monell analysis. The Monell analysis could have been done without having reached the question of Deputy Wenger because there's still a causation analysis, but the district court treated them as so interrelatedly connected that it chose not to do the Monell analysis. The question of inextricably intertwined at the court of appeals and for jurisdictional purposes turns in what the district court thought. It seems very odd to me. Well, and if that's the . . . District court judges as a result could create jurisdiction that otherwise wouldn't exist. That can't be right. Except that the sheriff's office that is faced with the district court's order is only faced with what is in front of us and what we have the opportunity to respond to, and so because the district judge didn't make the Monell analysis, didn't rule on the Monell analysis, but said that it's treating them one and the same, and because this case is now before you and it does . . . the pendant jurisdiction does . . . you do arrive at pendant jurisdiction. If it was being looked at separate and distinct, maybe you wouldn't find it, but because the district judge found it and because this case is before you on qualified immunity, they're both . . . they're all now before this court on a de novo review, and while reviewing the record de novo, this court can also find that the district court did not apply the law to its review of the claims against the sheriff's office when it deferred to its position on qualified immunity and did not even consider the Monell case. If this court looks to Buckler v. Israel, for example, the plaintiff brought similar claims against the sheriff's office in that case, and this court agreed with the district court and held the appellants have not provided sufficient evidence such that a reasonable jury could find that BSO exhibited a widespread customer practice. Well, this can be found in this case, too, but the district court did not do this analysis. So now, while it's before this case on . . . before this court on a de novo review, you can find that, and as stated in Buckler quoting Troop v. Sarasota County, a Section 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation. That action must also be proved to have been pursuant to an official sheriff's office policy which caused the injury. The district court does not apply this standard to the record evidence. The district court cited Monell, cited Luddoway, but no facts are applied to those cases. I've got your argument. Thank you, counsel. Ms. Heyer? May I please support Barbara Heyer on behalf of the appellee, Mr. Thompson's sister as the personal rep? The evidence before the court is diametrically conflicted with the presentation of Wengert and Yoder and Kosofius and his friends in terms of what happened that night. We have presented a case . . . Let me explain to you, at least speaking for myself, what my concern is. Ms. Taffey gives a completely different version of what took place than seven other officers at the scene. No, she does not. If you take a look at what has been said, everything that we have put in is supported by the record evidence as well as the testimony of the various officers. It shows the conflict in evidence and it shows key evidence. Let's go through. She says Thompson was not armed. That's correct. She was not armed. He did not fire at Mr. Wengert. That's correct. And she wasn't there. Of course not. Where is the evidence that supports that? The evidence that supports that is the very fact of the discrepancies between Wengert. Wengert says he's chasing him down two hallways and that there is a distinctive two shots fired at him. And then he sends forth a barrage of 28-5 shots, killing this man, shooting him eight times in the back, and then shooting him while he's on the ground in the groin. And he's saying he still keeps shooting because he's seeing him squeeze the trigger. He's 65 feet away in a dark hallway. It's not possible. If Thompson had a gun and he fired at Wengert and Wengert returned fire, does Wengert get denied qualified immunity? No, I'm not saying he did. If that were the facts, just as the court said, if the facts were as Wengert stated them, he would be entitled to qualified immunity. They are not. Don't forget, you have eyewitness testimony. The people cowering behind the apartment in the apartments, what did the one person hear? She didn't hear, stop, run, stop, I'm police. She didn't hear anything like that. What she heard was, I'm going to kill you, motherfucker, and then she heard a barrage of 25 shots. No distinctive shot fired, nothing was fired. You also have an interesting point . . . The district judge didn't say anything about the audio, and I listened to the audio, and it sounds like at least one shot was fired before the . . . The audio that you're listening to is not at the beginning of the shots. You're listening to the barrage of shots. There is no distinct one shot and then a barrage of shots, which you're listening to on the dispatch tapes, are coming from weeks. Why wouldn't the district court mention the audio in her decision? I'm sorry? Why wouldn't the district court mention the audio in her decision? I don't know why she didn't mention it was in the record. The audio, and I'm talking about the statement of the eyewitness where she says, I'm going to kill you, motherfucker. That's not an audio. That was a statement made by one of the eyewitnesses to the incident. Wangert confirms that prior to the shooting, Thompson said nothing to him. So, clearly, that was not Thompson saying, I'm going to kill you, motherfucker. That was Wangert saying it. You also have problems with the gun itself. The gun is a semi-automatic. When it's collected 51 feet away, and when you're saying that all these officers are agreeing with Wangert, that is not correct. Michelle and Weeks, the officers that were not with BSO, confirmed that the location of the gun was, in fact, 51 feet. Weeks, when he is allowed to peek in after Wangert tells him it's okay, sees the gun down the length of the hallway. Michelle, who is guarding the door that Yoder and Kosofius had come out of, says, oh, yeah, I saw the gun a few feet away. That is consistent with it being 51 feet away. You also have a gun that doesn't have a bullet in the chamber. Now, what is Tutler doing? Taffy's version is that after Wangert shot Thompson, he went to the car and retrieved a gun and brought it back and planted it? No, sir. That's not what she says? I said he left for 13 minutes, did not allow anyone to come in. The gun came in through Kosofius and Yoder. The shell casing, shell cartridge, and projectile came back with Wangert. What is the evidence of that specifically, that the gun came in through those two officers and the shell casing? They were coming in at that location, ran out. When Weeks was allowed to peek in and look down, he never saw Kosofius and Yoder. They had already exited out there. Yoder then protects the scene, says, nobody can come in, we're looking for a second suspect. Wangert, during this important time period, looking for a suspect, suddenly goes for 13 minutes to move his car. Then he comes back in again, and then it's out. Now, obviously, it's circumstantial evidence, but it's not unreasonable. It's very reasonable. What is not reasonable... But you have seven other officers from different law enforcement agencies all say that Wangert did not go back and get a gun and plant it. They also say, Wangert himself says he came back in when they're saying he never came back in again. And you're talking about seven individuals from different agencies? That is not correct. You have two people who are not in that department, Weeks and Michelle, and they both concur that the gun itself was 51 feet away. Now, you have a statement by Wangert and Yoder, we didn't move the gun. Now, conveniently, we've completely changed the testimony and, oh, I kicked it down the road. Clarify this for me now. Who confirms Ms. Taffy's version that Wangert went and got a gun and brought it back and planted it? The evidence, the physical evidence and the statements that conflict with each other show that. Did you depose Yoder? Yes. Did you clarify this question about when he said he didn't move it, whether he was referring to after it was 51 feet away or when it was near him? I think it was clarified. There was no question he was talking about. Well, your friend on the other side said that's not clear. We'll see what the deposition says. The deposition speaks, I believe, for itself. But, I mean, it is one interpretation of it is that he didn't move it after he kicked it. Well, that's one interpretation. That's the whole point of this. No, but you had a chance to. . . You deposed him, didn't you? Yes. Didn't you depose Yoder? Yes. Well, this seems to me that's on you as to clarifying what it meant, whether it was moved. There was no question in our mind when we deposed him that he had come up with a new angle. We questioned him. Oh, you said before you didn't move it. Oh, yes, I forgot I did push it down the . . . kick it down the door . . . the hallway. So, you know, these are conflicts. That's the whole point. That's what Toland talks about is you cannot just . . . You look at the conflicts. You have two different versions. Our version is not speculative. Our version is based upon the statements, the conflicts in the statements, and the evidence, the physical evidence. These statements, you can't ignore. You can't just say, Oh, gee, this man got shot eight times in the back, and once while he's on the ground because this man perceived that there was a gun or perceived that he made a mistake. He didn't say, I made a mistake. He didn't say, Oh, I thought there was a gun. He made up that gun. He made up the shots. Yoder also said in his first statement . . . He didn't make up the number of shots he fired, Wenger fired, right? No. We all agree that's 25? Oh, yeah. Oh, yeah. What's the theory why it would take 25 shots if it was just a murder and the other person's unarmed? Well, you have to know Yoder to understand that. This man actually testified . . . You mean Yoder or Wenger? I'm sorry, Wenger. He actually testified getting on his knee in the doorway and just shooting. And if you listen to the dispatch tape, you hear methodical boom, boom, boom, boom, boom, boom, boom. There was no reason for any of this. Well, there would be no reason unless two shots were fired at him first. Except there's no evidence to support two shots were fired at him. And you don't hear that on the audio? No. You do not hear two shots fired. Let me tell you, I went through this case like a fine-toothed comb. If there had been two shots fired to justify this action, we wouldn't be here. There is not. This man, Wenger, has lied consistently from beginning to end. And when it's convenient, when he needed to, he changed his story. Yoder supported him. Kosofius supported him. To say, gee, this couldn't have happened because seven people backed him up. They didn't back him up. They walked over themselves in terms of doing his bidding. Now let's, I would say, move over to Israel. Can I just ask one more thing about Wenger? I mean, so he's had all these investigations. Did any of them lead to findings that he had violated, you know, he'd lied? Of course not. And that's my whole point. My whole point is they have presented you with supervision, that supervisors go to the scene, that they do. I have a whole list here that I talked about. They report all use of force. Supervisor required to go to the scene. Supervisor filled out use of force. Deputies trained to de-escalation tactics. The EAMP notices are required. That came about in 2016. What was in place at the time of this shooting was that the officer determined if he did a report. He was the final arbiter of what was put in that report. The supervisors simply rubber-stamped it. And in terms of the EPA, there were six prior to this shooting, six EIP notices to say, hey, this guy's got an issue. Not one of his supervisors even knew about those notices, and none of them acknowledged them. Now, what did Dale do? He is Israel's second in command. I asked him, when you came in, any issues with use of force? Excuse me a minute. Any issues with use of force? No, no, everything's fine. Okay? If you take a look at their own records in 2012, they did a study about their use of force. 2012 said, self-reporting, there must be a mechanism to verify the use of force. The records are incomplete. 2013, incomplete. Need to scrub for completeness and accuracy on use of force forms. Again, 14, only select info in inconsistent. 15, use of force complaints are not adequately tracked. That's the record that you have on Israel. You also have the record that Israel personally signed Wengert's reinstatement after he had been found not guilty, beyond a reasonable doubt. No administrative hearing was held. Immediately puts him back on the road, puts him with K9. K9 is one of the least supervised units in the agency. So you have the fact that Israel personally signed it. You have the fact that Israel went to the scene. He has to personally participate in the alleged constitutional violation itself. No, he does not. He has to have... between his actions and those of Wengert. Isn't that what our precedent says? And that's exactly what we're talking about. We're talking about the fact that they knew prior to 2014 that their use of force were not being properly investigated. That their officers weren't being supervised. That they were being allowed to give their own version and that that would be said okay. And you have to... you can't ignore Dale's testimony. Dale, who comes out and says, okay, he signed it personally, but I'm the one that decides on the hiring and firing. Ignore the fact that he signed it. Doesn't matter. And as far as the EPA goes, oh, gee, they said we overreported. There's this great study about that. It is a lie. There is no study. This man had the audacity to come into this deposition and another deposition and make up something in order to try and protect the agency and to protect Israel. Those are the facts. We have submitted evidence to support everything we have said. It is not speculation. Thank you very much. Thank you, Ms. Heyer. Mr. Cochran. Yes, although we had originally designated Mr. Reinstein since the majority of it, I'm going to take that if that's okay with the court. You may. Thank you, Your Honor. First, just responding to one of the issues with respect to Israel, the only record evidence supports that at any time Deputy Wengert was accused of excessive force. He was investigated, at times put on lengthy administrative leave, and ultimately cleared by the State Attorney's Office, the BSO, the FBI, and a grand jury. That's the result of that. With respect to the comment that by nature of signing documents, Sheriff Israel was personally participating, that would be akin to the president of a university signing all the diplomas for the graduates. It doesn't mean that he had any personal involvement in the situation. With respect to the issues with Deputy Wengert, the burden on the plaintiff here is to prove that there is no entitlement to qualified immunity. It's not disputed that Deputy Wengert was acting as discretionary authority. Here, the plaintiff claims that Thompson was unarmed, but there's not evidence of that. It's merely hearsay. There's a testimony from a woman named Imani Key that some unidentified individual known as Nate the Bottle Man said that he didn't see him have a gun that night. That's where they get that from. Or just the evidence about where Detective Caceres measured the length of the gun at the end of that. What about the thing that the neighbor heard? Right. The testimony of the neighbor is that she heard before any shots were fired, at some point before any shots were fired, I'm going to kill you, mother effer. She doesn't identify who said that. She was actually given the proximity to her apartment, and the way all the physical evidence and all the testimony was would have been closer to Thompson than she would have been to Wengert. And that comment would have been more consistent with him saying that before the initial shot was fired, because it's undisputed based on the evidence that the initial shot was fired by Thompson and not Wengert. So that does not create a genuine issue of material fact, especially where it's unidentified who she's even talking about. Well, there were two friends of Thompson, Imani Key and Moss, Randy Moss, who said they saw Thompson that day and he didn't have a gun. To their knowledge, he didn't have a gun? Correct. Well, that would be consistent with all the officers' testimony that when Thompson was initially confronted outside of the buildings before he started to flee, he grabbed at his pockets or waistband or crotch, depending on who testified, grabbed in that general vicinity, took off, and then later shot a firearm, that he had a firearm concealed. So they wouldn't necessarily see that he has a concealed firearm. Neither of them testified definitively that he did not have one, and whether he had one at some point earlier in the day does not really create a material issue of fact about whether he had one at the time that Officer Deputy Wengert returned force. Thank you, Your Honors. Does that complete your argument? All right.